# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Steven Hayes,

        Plaintiff,

v.

Twin City Carpenters & Joiners Pension
Plan, *et al.*

        Defendants.

File No. 17-cv-05267 (ECT/BRT)

**OPINION AND ORDER**

---

Gregory R. Merz and John M. Nichols, Gray Plant Mooty, Minneapolis, MN for Plaintiff
Steven Hayes.

Amanda R. Cefalu and Henry M. Helgen, III, Kutak Rock, Minneapolis, MN for
Defendants Twin City Carpenters & Joiners Pension Plan, *et al*.

---

In this ERISA lawsuit, Plaintiff Steven Hayes seeks to recover pension benefits from

Defendant Twin City Carpenters & Joiners Pension Plan ("the Plan"). The Plan began

paying Hayes a monthly retirement benefit in March 2011. The Plan suspended his benefits

in October 2013, after receiving information suggesting Hayes may have violated a Plan

rule that prohibited pensioners from working in certain employment for forty hours or more

per month. Following a lengthy administrative-appeal process, the Plan's Claim Appeals

Committee affirmed the initial decision to suspend Hayes's benefits. Hayes and

Defendants have filed cross-motions for summary judgment. Should their

summary-judgment motion be denied with respect to Hayes's benefit claim, Defendants

alternatively seek remand of that claim. Defendants' summary-judgment motion will be

granted against Hayes's breach-of-fiduciary duty claim. The benefits claim will be remanded to the Committee for further consideration consistent with this Opinion and Order and in all other respects, the Parties' summary-judgment motions will be denied. To summarize, the administrative process that led to the decision to suspend Hayes's benefits was flawed, though not so seriously as to warrant heightened or de novo review of the Committee's final decision. But the Committee's decision cannot survive abuse-of-discretion review. This is because the Committee adjudicated Hayes's claim under inapplicable Plan terms, nothing about the Committee's decision or adjudicative process suggests it considered or construed applicable terms that, when examined closely, are materially different from the terms the Committee considered, and the terms the Committee should have applied pose significant interpretive challenges. Because it remains unclear whether Hayes is entitled to the benefits he seeks, a remand is the appropriate remedy.

## I[1]

*December 2010 to March 1, 2011—Hayes applies for, and is approved to receive, unreduced early retirement benefits under the Plan.* The Plan is a multi-employer pension

---

[1] The facts in this section are taken from the Complaint, Answer, and documents in the administrative record of Hayes's pension-benefit claim and, unless noted otherwise, are undisputed. The Parties did not jointly file the entire administrative record. Instead, Hayes and Defendants each separately filed a subset of documents from the record that each considers relevant to the pending motions. *See* Merz Aff. ¶¶ 2–3, Exs. A, B (filed by Hayes) [ECF No. 41]; Cefalu Aff. ¶¶ 2–3, Ex. 1 (filed by Defendants) [ECF No. 37]. Many documents were filed by both Hayes and Defendants; some documents were filed by only one or the other. Regardless, the Parties' administrative-record submissions share identical pagination (appearing in the lower right corner of each document beginning with the prefix "CARPS"). Therefore, and in the interests of convenience and efficiency, citations to

fund, Compl. ¶¶ 2, 7 [ECF No. 1]; Answer ¶ 2 [ECF No. 9], and Hayes is a participant in the Plan, Compl. ¶¶ 6, 13; Answer ¶¶ 6, 13.  In December 2010, Hayes applied to the Plan for "Unreduced Early Retirement Benefit[s]" commencing March 1, 2011.  AR 423–25, *see also* AR 755, 1192–93; Defs.' Mem. in Supp. at 4 [ECF No. 39]; Pl.'s Mem. in Supp. at 4 [ECF No. 40].  In his application, Hayes identified February 28, 2011, as the last date he "worked, or will work, in the Construction Industry."  AR 423.  The Plan prohibited retired participants who received benefits from being employed or engaging in work under certain circumstances.  AR 770–74, 1194–97.  The Plan referred to this generally as "Disqualifying Employment"—as in, employment that, if engaged in by the retiree, might disqualify the retiree from receiving benefits.  AR 770, 1194–95.[2]  In his application for benefits, Hayes acknowledged his obligation to comply with these limitations.  AR 425.  The Plan approved Hayes's claim and began paying a monthly benefit effective March 1, 2011.  AR 422.

*October 2013—The Plan suspends Hayes's benefits for engaging in Disqualifying Employment.*  In a letter dated October 15, 2013, the Plan, through its Fund Administrator, notified Hayes that it had "been informed that [he was] performing Disqualifying Employment while continuing to receive [his] pension," and that as a result his pension

<hr>

documents from the administrative record will appear in this Opinion and Order with the prefix "AR" and reference to the page number, simply as "AR __," regardless of filer.

[2]      The Plan was designed to restrict certain pensioners from competing for jobs with active union-member Plan participants.  *See Eisenrich v. Minneapolis Retail Meat Cutters & Food Handlers Pension Plan*, 574 F.3d 644, 649 (8th Cir. 2009) (citation omitted) (describing the purpose and importance of Congress "allowing [ERISA] plans to suspend the benefits of retirees who accept certain kinds of postretirement employment").

benefits would be "suspended effective November 1, 2013." AR 329–31. Under the Plan, as the Administrator explained in the letter, "Disqualifying Employment" was: "Any employment of forty (40) hours or more in a one (1) month period in Covered Employment (defined as Employment for which an Employer has agreed to contribute to the Pension Fund pursuant to the terms of a written Collective Bargaining Agreement or Participation Agreement)." AR 330. The Administrator also quoted an "exception" to the general suspension-of-benefit rule as follows:

> Effective April 1, 2007, if you work more than forty (40) hours per month in Covered Employment, the Plan will not suspend your benefit unless your work in Covered Employment in that month and the previous eleven (11) months totals more than four hundred eighty (480) hours. If you have worked or been paid for four hundred eighty (480) or more hours in Covered Employment in the last twelve (12) months, your benefit will be suspended. If you have worked or been paid for any Disqualifying Employment that is not Covered Employment during the twelve (12) month period, you are not eligible for this exception to the rule and the Plan will suspend your benefit for any month in which you work more than forty (40) hours in Disqualifying Employment.

*Id.* The Administrator did not say whether it had considered this exception in Hayes's case. *See* AR 329–31. The Administrator notified Hayes that, to obtain reinstatement of his pension benefit, he "must cease working in Disqualifying Employment and notify [the Plan] in writing that [he had] done so." AR 331. The Administrator requested copies of Hayes's tax returns for the years 2011, 2012, and 2013, and notified Hayes "that any pension payments [he] previously received while working in Disqualifying Employment will need to be reimbursed to the Plan." *Id.* The Administrator explained that, if he believed the suspension of his benefits was erroneous, Hayes could "contact the

Administrator to provide any information [he] may have to assist in resolving this issue." *Id.* The Administrator also informed Hayes that he had "the right to appeal this decision to the Board of Trustees" and referred Hayes to the appeal-rights provisions of the Summary Plan Description. *Id.* The Administrator did not describe in this letter the information or rationale upon which it based its decision to suspend Hayes's benefits. *See* AR 329–31.

    *November 2013—Hayes disagrees with the Plan's suspension of his benefits; the Plan responds and clarifies its explanation for suspending benefits, and Hayes appeals.* Hayes responded to the Administrator in a letter dated November 4, 2013. AR 333. In his letter, Hayes wrote that he disagreed with the determination that he was performing Disqualifying Employment and requested copies of "all documents, records, and other information relevant to [his] claim," as permitted by the Plan. *Id.* (emphasis omitted). In a letter dated November 8, the Administrator denied Hayes's request for documents relevant to his claim. AR 334–35. The Administrator explained that Hayes's request for documents could be approved only if he appealed the decision to suspend his benefits and that, before the Plan would permit him to appeal, Hayes must first "explain 'why the determination should be reviewed.'" AR 334. The Administrator also explained that, before he would be allowed to appeal, Hayes must provide information regarding (what the Administrator previously determined to be) his Disqualifying Employment. *Id.* Finally, the Administrator took the position that, because in its view Hayes had failed to notify the Plan of the Disqualifying Employment, the Plan was "entitled to 'presume that [Hayes had] worked for at least forty (40) hours in that month and any subsequent month'"

and that Hayes now had the burden of "demonstrating to the satisfaction of the Trustees" that his benefits should not have been suspended under the Plan. AR 334–35. Hayes responded with a letter to the Administrator on November 14. AR 336. In it, he wrote that he disagreed with the Administrator's determination and that "the purpose of this letter is to file a formal appeal of that determination." *Id.* Hayes requested that his appeal include "a more thorough investigation that includes information from me and my employer, which it does not appear was part of the original determination." *Id.* In a second letter dated November 18, Hayes provided information regarding his continued employment in response to the Administrator's request. AR 337. Hayes identified his employer as Alltech Engineering Corporation in Mendota Heights, Minnesota, *id.*—the same employer for whom Hayes had worked before he retired, AR 378. He described his job title as "Project Manager" and his duties as sales, estimating, and managing industrial projects. AR 337.

*December 2013—Hayes retains counsel, who contacts the Plan and elicits additional explanation for the Plan's decision to suspend Hayes's benefits.* Hayes retained counsel, who wrote to the Administrator on December 19, 2013, repeating Hayes's request for records. AR 338–39. Hayes's lawyer explained that his "objective in assisting Mr. Hayes [was] to facilitate a resolution of this issue, and to provide a clearer understanding for both parties as to the limited nature of Mr. Hayes' employment with a contributing employer, so as to avoid issues in the future." AR 339. The Plan responded through its counsel in a letter dated December 30. AR 340–42. In that letter, the Plan's counsel wrote that, owing to the "confusing" procedural posture of Hayes's claim and "due to some loose usage of terms in communications between the parties," counsel would "explain the Plan's

position on the issue." AR 340. The Plan's counsel disclosed that "a routine payroll audit of Alltech" showed that Hayes had "done some work for pay" at Alltech after his pension benefits commenced. *Id.* Counsel summarized a Plan term that he characterized as requiring retirement-benefit recipients "to notify the Plan if he or she is starting any type of work that is or may be disqualifying even if he or she does not expect to work 40 or more hours per month," and noted that the Plan had no record showing Hayes had notified it of his continued employment with Alltech. *Id.* "In such a case," the Plan's counsel wrote, the Plan's "Trustees are entitled to 'presume that you [the participant] have worked for at least forty (40) hours in that month and any subsequent month.'" AR 340–41. Counsel explained that the Plan "relied on the evidence that Mr. Hayes performed some work for Alltech in applying the above presumption[] to suspend his benefit," and that Hayes now had "the burden of 'overcom[ing] the[ ] presumption[] by demonstrating to the satisfaction of the Trustees that they are not correct and that benefits should not actually be suspended under the rules of the Plan.'" AR 341 (second alteration in original) (citation omitted). The Plan's counsel concluded his letter by asserting that "this matter is not subject to appeal until Mr. Hayes has fulfilled his obligation to provide the requested documents and has either provided evidence to rebut the above presumption or has declined in writing to do so." *Id.* (Counsel separately noted that Hayes's retiree health coverage was also "cancellable due to work in prohibited employment," but directed Hayes's counsel to the Health Plan's trustees to address this issue. *Id.*) Hayes's counsel responded by letter the next day (December 31) and committed to "work[ing] with Mr. Hayes to collect the requested information" and submit it to the Plan. AR 343–44.

*January 2014 to October 2014—Hayes's counsel and the Plan communicate in an effort to identify, gather, and submit information relevant to Hayes's benefit claim.* In January 2014, Hayes and the Plan began an information-gathering process that would last for over two years. (The Plan's Claim Appeals Committee did not issue a final decision on Hayes's appeal until June 2, 2016, AR 951–57, but more on that later.) This information-gathering process included several more significant moments during its first several months. In mid-January 2014, Hayes's counsel submitted Hayes's 2011 and 2012 tax returns. AR 345–50. Two months later, in mid-March, Hayes's counsel provided the Plan with an affidavit of Alltech's CEO, Robert Lawrence. AR 352–55. In his affidavit, Lawrence testified about the nature of Hayes's post-retirement work, its significance to Alltech, and Hayes's compensation. *See id.* Lawrence testified that Hayes had "been paid his regular wage rate as a Project Manager for 39 hours of work per month." AR 353. Lawrence acknowledged that Hayes's income was "greater than what would seem to correspond to an employee working 39 hours per month," but attributed this to discretionary bonus payments Alltech had made to Hayes in consideration for his "unique circumstances as an employee." AR 355. In August 2014, Hayes notified the Plan that he was returning to work at Alltech on a full-time basis effective September 1, 2014. AR 360. Though Hayes's return to full-time work meant his right to claim pension benefits would cease at that time, Hayes made clear that he intended that his "appeal remain[] active for the suspension of benefits from November 1, 2013 through August 31, 2014." *Id.* Hayes also notified the Plan that he had terminated his relationship with the first lawyer who represented him in his administrative appeal. *Id.* In October 2014, Hayes wrote to the Plan

asking about the status of his appeal. AR 361. At some point, Hayes also submitted his 2013 tax returns. AR 362–65.

*November 2014 to January 2016—Hayes retains a new lawyer, who continues the process of gathering and submitting relevant information to the Plan.* In November 2014, Hayes retained new counsel, AR 373, and the information-gathering process continued. The next month, in December, Hayes's new attorney requested and received a copy of Hayes's "pension file" from the Plan. AR 369, 371–72. On March 3, 2015, Hayes's counsel submitted to the Plan a memorandum and exhibits "as a supplement to the claim submitted by Mr. Hayes on 14 November 2013." AR 240–51. In the memorandum, Hayes's counsel argued that Hayes's challenge to the decision terminating his benefits was timely and sufficient, that Hayes had notified the Plan of his continued employment at Alltech, that the Plan was incorrect to apply the forty-hour presumption to Hayes's claim, and that, presumption or not, Hayes had provided sufficient evidence to show that he never worked more than thirty-nine hours per month for Alltech. *See* AR 240–50. Having received no "formal response" to his March 3 submission, Hayes's attorney emailed the Plan's counsel on July 14, 2015. AR 942. In his email, Hayes's attorney described his understanding that the Plan's "Appeals Committee was seeking additional evidence [beyond what was submitted with the March 3 memorandum] of the hours Mr. Hayes had worked," asked what kind of evidence the Plan sought, offered to facilitate the Plan's efforts to audit Alltech's records of Hayes's employment, and requested "any details" the Plan could provide regarding "undocumented reports" that Hayes had worked more than thirty-nine hours per month. *Id.* The Plan's counsel responded the next day, identifying

categories of additional evidence the Plan believed would be probative of Hayes's claim. AR 941–42. On January 13, 2016, Hayes's counsel provided the Plan with specific information responsive to the categories of evidence identified by the Plan. AR 944. At the same time, Hayes's counsel also submitted documents showing Hayes's expense records (*i.e.*, gas receipts, automobile maintenance expenses, telephone records, hotel receipts, etc.) associated with his post-retirement Alltech employment. AR 3–165.

*April 2016 to June 2016—The Plan's Claim Appeals Committee affirms the initial decision to suspend Hayes's benefits, but bases its decision on inapplicable Plan terms.* At its meeting of April 21, 2016, the Appeals Committee decided to affirm the Administrator's initial decision to suspend Hayes's retirement benefits, and the Plan's counsel explained the decision in a letter dated June 2, 2016. AR 951–57. In the letter, the Plan's counsel reviewed the evidence the Committee considered in reaching its decision, AR 951–52, quoted what counsel described as the "relevant provisions of the Plan Document . . . in respect to suspension of benefits," AR 952–54, and explained the rationale underlying the Committee's decision, AR 954–57. In fact, the suspension-of-benefit provisions quoted in the letter as having been considered by the Committee did not apply to Hayes's claim. The letter quoted the suspension-of-benefits provisions applicable to "Normal Retirement Benefit[s]," AR 952–54, when it should have cited separate suspension-of-benefits rules applicable to Unreduced Early Retirement Benefits, AR 1194–97, the type Hayes had received and which were at issue in his claim. Leaving this error aside for now, counsel explained that the Committee's decision proceeded essentially in two steps. First, the Committee determined Hayes had violated a Plan term requiring the submission of written

notice to the Plan "within thirty (30) days after starting work of a type that is or may be Disqualifying Employment." AR 953–54. In other words, the Committee determined that the Plan required Hayes to submit written notice within thirty days of the date he commenced his post-retirement employment with Alltech—March 1, 2011—of the fact that he was continuing to work there, but that Hayes had not provided this notice. AR 954. The Committee determined that, as a consequence of this failure, the Committee was "entitled to presume Mr. Hayes was engaged in Disqualifying Employment to such an extent that his benefit is subject to suspension from March 1, 2011 through August 31, 2014 (when Mr. Hayes advised the Plan he had returned to full time employment and voluntarily suspended his benefit)." *Id.* Thus, the Committee determined, the burden fell to Hayes to "prove 'to the satisfaction of the Trustees that his work was not, in fact, an appropriate basis, under the Plan, for suspension of benefits.'" *Id.* (citation omitted). Second, the Committee reviewed the evidence before it and determined Hayes had failed to meet his burden. AR 954–57. The Committee determined that much of the evidence before it—including cell-phone records, receipts relating to vehicle usage, and income-tax records—was not probative of whether Hayes had worked more than thirty-nine hours per month for Alltech. AR 955–56. The Committee noted the absence of some information "likely to be probative, including payroll summaries and paycheck or electronic deposit stubs; emails; credit card statements, and; [sic] job sign in sheets and records," and inferred that "these documents, if disclosed, would not support Mr. Hayes's claim." AR 956. The Committee discounted affidavits attesting that Hayes had worked thirty-nine hours every month at Alltech after March 1, 2011, as "self-serving and unsupported by any objective

11

documentary evidence." *Id.* Though the Committee had received "anecdotal evidence from other Alltech employees, who reported anonymously that Mr. Hayes was regularly employed for much more than 39 hours per month during the relevant period," it "did not rely upon the anonymous reports that Mr. Hayes was working significantly above 40 hours per month due to the fact these accounts were from sources whose credibility could not be verified." AR 956–57. The Plan's counsel closed the letter by advising Hayes that, because his "appeal was denied," he had the right to receive access to documents and other information relevant to his benefit claim and that he had the right to bring a civil action under ERISA. AR 957.

*December 2016—Hayes retires again, and the Plan begins recouping overpaid benefits.* Hayes retired again effective December 31, 2016. AR 192. Hayes's retirement triggered the reinstatement of his pension benefits. However, the Committee's determination that Hayes had engaged in Disqualifying Employment while receiving retirement benefits between March 2011, and the suspension of his benefits effective November 1, 2013, meant the Plan believed it had overpaid benefits to Hayes in the amount of $233,508.48. AR 192–93. The Plan contained a provision addressing this situation: "Overpayments attributable to payments for any month or months for which you engaged in Disqualifying Employment will be deducted from pension payments otherwise paid or payable subsequent to the period of suspension of benefits." AR 774. In a letter dated December 8, 2016, the Administrator notified Hayes that the Plan would recoup the overpayment by deducting amounts from his monthly pension benefits until the full amount of the overpayment had been recovered. AR 192–93.

*November 2017—Hayes commences this action.* Hayes commenced this action on November 29, 2017. *See* Compl. In his complaint, Hayes named as Defendants the Plan, the Board of Trustees of the Plan, the Claims Appeals Committee, and individuals who served on the Board of Trustees and Appeals Committee. Compl. ¶¶ 2–5. Hayes has since agreed "to not pursue claims against the Individual Defendants." Stipulation ¶ 3(a) [ECF No. 22]. Hayes asserts claims under just the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). *See* Compl. ¶¶ 63, 67, 71. He seeks recovery of pension benefits the Plan did not pay him in the amount of "at least $79,781.50." *Id.* ¶ 61. Hayes also seeks relief with respect to benefits the Plan determined were improperly paid and therefore have been, or will be, recovered by the Plan through offset. *Id.* ¶ 65. Hayes alleges that "Defendants wrongfully have recovered and continue to recover from Plaintiff's past and future pension benefits alleged overpayments of pension benefits paid to Plaintiff from March 1, 2011 through October 31, 2013, which such amount Defendants have determined to be $233,508.48." *Id.* ¶ 66. Hayes also alleges that Defendants breached fiduciary duties in the adjudication of his claim. *Id.* ¶¶ 68–71. Hayes seeks to recover past-due benefits, equitable relief, interest, and attorneys' fees. *Id.* at 16–17, ¶¶ 1–6.

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only "if the evidence is

such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.*

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be

drawn in his favor." *Id.* at 255 (citation omitted). Especially relevant to suits under ERISA,

"in ruling on a motion for summary judgment, the judge must view the evidence presented

through the prism of the substantive evidentiary burden." *Id.* at 254. As the Supreme Court

explained in *Anderson*, a public-figure defamation case:

> [A] court ruling on a motion for summary judgment must be
> guided by the *New York Times* [*Co. v. Sullivan*, 376 U.S. 254
> (1964)] "clear and convincing" evidentiary standard in
> determining whether a genuine issue of actual malice exists—
> that is, whether the evidence presented is such that a reasonable
> jury might find that actual malice had been shown with
> convincing clarity.

*Id.* at 257. Here, it is necessary first to determine the burden Hayes faces in challenging

the decision to suspend his benefits and then to consider the Claim Appeals Committee's

final decision in light of that burden, summary-judgment law, and ERISA.

A

The basic law governing the determination of the correct standard of review (*i.e.*,

the burden Hayes faces in challenging the suspension of his benefits) is settled. Suits

brought under § 1132(a)(1)(B) to recover benefits allegedly due to a participant are to be

reviewed de novo unless the benefit plan gives the administrator discretionary authority to

determine eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

115 (1989). If the plan grants the administrator such discretion, then "review of the

administrator's decision is for an abuse of discretion." *Johnston v. Prudential Ins. Co. of

Am.*, 916 F.3d 712, 714 (8th Cir. 2019) (quoting *McClelland v. Life Ins. Co. of N. Am.*,

679 F.3d 755, 759 (8th Cir. 2012)).  Here, there is no dispute the Plan grants the Trustees "full authority to interpret and apply the provisions of" the Plan and "full authority to determine all issues of eligibility for benefits, and issues regarding the amount and types of benefits payable."  AR 781.  Ordinarily, the presence of this discretion-granting language would be enough to warrant abuse-of-discretion review.  Hayes argues the decision to deny his claim should nonetheless be reviewed de novo because, he says, the Plan committed several legal violations in adjudicating his benefit claim.

1

Hayes first argues that the Claim Appeals Committee lacked a quorum when it affirmed the initial decision to suspend his benefits.  Pl.'s Mem. in Supp. at 17–18.  Hayes contends that the absence of a quorum "negates every action the Committee took with respect to [his] benefit claim," and that "*de novo* consideration is required because the Court cannot defer to, or for that matter review, a decision that as a matter of law is the same as no decision at all."  *Id.* at 18.  Hayes grounds this argument on *McKeehan v. Cigna Life Insurance Co.*, 344 F.3d 789 (8th Cir. 2003), an ERISA case he says stands for the proposition that "[w]here a plan confers discretion on one party to make claims decisions, but another person makes the decision, the Court must apply a *de novo* standard of review," Pl.'s Mem. in Supp. at 17, and on Minnesota Court of Appeals cases addressing the consequences of a lack of a quorum under Minnesota law, *id.* at 18.

The record shows a quorum was present when the Claim Appeals Committee decided Hayes's claim, but why this is so requires explanation.  Start by framing the issue.  A "quorum" is "[t]he minimal number of officers and members of a committee or

organization, usually a majority, who must be present for valid transaction of business." *The American Heritage Dictionary of the English Language* 1439 (4th ed. 2009). To determine whether a quorum existed at any given committee meeting, it usually is necessary to know (1) the identity and number of committee members, (2) the identity and number of members whose presence the committee's governing documents require for a quorum, and (3) the identity and number of members who were present at the meeting in question. Here, the Parties agree on the second and third of these questions. The Plan says that "[a] quorum of a Committee is a majority of the members of the Committee," AR 1249, and two trustees attended the meeting at which a final decision was made on Hayes's claim, AR 548–56. To state the obvious then, for two trustees to be "a majority of the members of the Committee," AR 1249, the Claim Appeals Committee must be comprised of three or fewer members. Hayes avers the Committee had four members when it made a final decision on his claim, Pl.'s Mem. in Supp. at 14, 17, and Defendants say it had three, *see* Defs.' Resp. Mem. at 2–4 & n.1 [ECF No. 44].

The Parties' dispute over this issue boils down to whether an "alternate" member of the Claim Appeals Committee must be counted to determine the number of Committee members. Hayes says he must, Pl.'s Reply Mem. at 2–3 [ECF No. 47], and Defendants say not, Defs.' Resp. Mem. at 3 n.1. Citing to minutes of a February 2015 annual meeting of the Board of Trustees, Hayes asserts that, when it made a final decision on his claim in April 2016, the Claim Appeals Committee was "composed of Trustee Hamilton, Trustee Johnson, Trustee Perrier, Alternate Trustee Marquis, Fund Counsel Anderson, and the

Fund Administrator." Pl.'s Mem. in Supp. at 14; D 64.[3] Defendants do not dispute this description of the Committee's composition in April 2016.[4] The Parties agree that the Plan's counsel and administrator were non-voting Committee members and do not count in resolving whether a quorum existed. Pl.'s Mem. in Supp. at 14; Defs.' Resp. Mem. at 3 n.1. Of the Committee members eligible to vote, two were present at the April 2016 meeting: Hamilton and Perrier. AR 548, 554–55. Hayes argues that the Committee consisted of four "voting" members, and that two is not "a majority of the members" of a committee of four. Pl.'s Mem. in Supp. at 14. Of course, to argue as Hayes does that the Committee had four voting members requires including Alternate Trustee Marquis in the count. Defendants argue that the Plan requires counting alternate trustees only if they were "empowered [to] act 'in the absence of a regular Trustee.'" Defs.' Resp. Mem. at 3 n.1 (quoting AR 1240).

An alternate trustee should not be counted to determine the Committee's overall size, and therefore the Committee acted with a quorum when it met and rendered the final decision on Hayes's claim. By definition, an alternate trustee or committee member has

---

[3] The pagination prefix "D" appears on a handful of documents in the administrative record—all minutes of annual meetings of the Board of Trustees—at the end of Exhibit A to the Affidavit of Gregory R. Merz. ECF No. 41. No explanation is given for why these documents have a different pagination prefix, but it does not seem to matter. The Parties do not dispute that these documents are part of the administrative record.

[4] The Parties seem to agree, but do not explain why, minutes of the Board of Trustees' February *2015* "Annual Meeting" show the Claim Appeals Committee's composition in April *2016*. Perhaps there was a February 2016 annual meeting, but the Committee's composition was not addressed or altered. Perhaps there was no February 2016 annual meeting. Regardless, there is no good reason to second-guess the Parties and their agreement on this issue.

no vote unless serving (as an alternate) for an absent regular member. *See* AR 1240. It would make little sense to determine a committee's size by counting individuals whose voting power is contingent on the absence of regular committee members. Put another way, alternate members usually are not intended to increase a committee's size for all purposes; they are intended as a safeguard against the unavailability of regular members with respect to particular actions. The Plan is consistent with this common-sense understanding. It says "[a]n alternate Trustee will act *in the absence of a regular Trustee* in the order in which they are designated as alternates." *Id.* (emphasis added). Though the Plan also says that "[f]or purposes of determining a quorum, designated alternate Trustee(s), if any, will be included," AR 1242 (second alteration in original), this is best understood to refer to determining a quorum at any given meeting, not to determining the size of a committee. The sentence appears in a section of the Plan regarding the conduct of meetings (entitled "Meetings – Notices; Quorum; Voting."), not the composition of committees. *Id.* Committees—their identities, purposes, and composition—are addressed separately. AR 1249–51. Hayes cites several cases for the proposition that decisions made without a quorum are invalid, Pl.'s Mem. in Supp. at 18, but he cites no authority that would support counting an alternate trustee or member to determine a committee's size. To summarize then, the Claim Appeals Committee had three members at the time it made a final decision on Hayes's benefit claim, and two of those members (a majority) attended the meeting and voted on Hayes's claim, meaning the Committee acted with a quorum.[5]

---

[5] The determination that the Committee acted with a quorum at its April 2016 meeting obviates the need to consider Defendants' argument, supported by the extra-record

Hayes next argues that procedural irregularities tainted the Committee's decision to suspend his benefits and require the decision to be reviewed here de novo. Pl.'s Mem. in Supp. at 19–24. Hayes begins this argument by citing *Woo v. Deluxe Corp.*, 144 F.3d 1157 (8th Cir. 1998), and describes its rule: "In this Circuit, material, probative evidence demonstrating that (1) a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to a plan participant require[s] the Court to apply a less deferential standard of review [to] the fiduciary's decision." Pl.'s Mem. in Supp. at 19 (citing *Woo*, 144 F.3d at 1160). "The Supreme Court's decision in [*Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 115–16 (2008)] abrogated *Woo* to the extent *Woo* allowed a less deferential standard of review based on *merely* a conflict of interest." *Boyd v. ConAgra Foods, Inc.*, 879 F.3d 314, 320 (8th Cir. 2018) (citation omitted). But the Eighth Circuit "has not definitively resolved the impact of *Glenn* on the '*procedural irregularity* component'" of *Woo*. *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 830 n.3 (8th Cir. 2014) (quoting *Wrenn v. Principal Life Ins. Co.*, 636 F.3d 921, 924 n.6 (8th Cir. 2011)), *as corrected* (July 15, 2014); *see also Leirer v. Proctor & Gamble Disability Benefit Plan*, 910 F.3d 392, 396 (8th Cir. 2018) (citation omitted) (same). Assuming the procedural irregularity component of *Woo* remains good law, "[t]he mere presence of procedural irregularities . . . does not warrant the less deferential standard."

---

Declaration of Rick Lemke [ECF No. 45], that the Committee considered Hayes's claim again at its June 1, 2016 meeting and that a quorum was present at that meeting. Defs.' Resp. Mem. at 3–4; Pl.'s Reply Mem. at 3–5 (objecting to the submission and consideration of the Lemke Declaration).

*Hillery v. Metro. Life Ins. Co.*, 453 F.3d 1087, 1090 (8th Cir. 2006) (citation omitted). "To invoke this standard, any alleged procedural irregularity must be so egregious that it might create a 'total lack of faith in the integrity of the decision making process.'" *Id.* (quoting *Layes v. Mead Corp.*, 132 F.3d 1246, 1251 (8th Cir. 1998)). The procedural irregularities Hayes identifies do not meet this standard, leaving no need here to determine whether the procedural irregularity element of *Woo* remains good law.

Hayes points out that the Plan required the Claim Appeals Committee to "consist of an equal number of Employer and Union Trustees," AR 1249, and he asserts that the Committee responsible for the final determination of his claim did not meet this requirement, thus denying him "a Committee composed of Trustees who represented the competing interests of management and labor in equal number," Pl.'s Mem. in Supp. at 19. It is true that the Committee's overall composition did not meet this requirement when the final decision on Hayes's claim was made. The Committee tilted in favor of Union representation—Hamilton was an Employer Trustee, and Johnson and Perrier were Union Trustees. AR 1259. But this flaw does not give any reason to doubt the integrity of the Committee's process. The two trustees who attended the April 2016 Committee meeting and made the final appeal decision, Hamilton and Perrier, came respectively from the Employer and Union sides, and that 1:1 ratio of Employer-to-Union composition is at least consistent—if not compliant—with the intent of the Plan. Though Hayes expresses the concern in his briefing that "his claim appeal did not have the critical mass of opinions and perspectives the Trust Agreement ordained as necessary to reach a decision on behalf of the Plan," Pl.'s Mem. in Supp. at 20, the Committee's 2-to-1 Union-to-Employer

representation would, if anything, risk tilting that "mass of opinions and perspectives" in his favor.  Even if these concerns established the existence of a "serious procedural irregularity," Hayes has not shown how the Committee's composition actually "caused a serious breach of the plan administrator's fiduciary duty to" him, as *Woo* requires, 144 F.3d at 1160; he does not connect the flaw he identifies to the Committee's final decision.[6]

Hayes asserts that "the process leading up to the final decision on appeal was pockmarked with numerous irregularities" beyond the Committee-composition issue.  Pl.'s Mem. in Supp. at 20.  He identifies three in particular: the Plan's initial refusal to provide him with requested documents; the Plan's instructions to Hayes early in his claim process that he would be permitted to appeal only if he first "explain[ed] 'why the determination should be reviewed,'" AR 334; and the time between the Plan's initial decision to suspend his benefits in October 2013, and the final decision on appeal in June 2016.  Pl.'s Mem. in Supp. at 20.  Each of these concerns has support, but none rises to the level sufficient to prompt de novo or other heightened review of the Claim Appeals Committee's final decision under Eighth Circuit law.

The Administrator's initial refusal to give Hayes the documents he requested, AR 334; violated the Plan, AR 1216 ("Upon request and free of charge, the claimant (or claimant's duly authorized representative) will receive reasonable access to and copies of all documents, records, and other information relevant to the claim."); and perhaps ERISA,

---

[6]     Hayes cites no authority apart from *Woo* and the Eighth Circuit's ensuing line of procedural-irregularity cases to support his argument that the Committee's composition justifies de novo review.

29 U.S.C. § 1024(b)(4). But the Plan later provided Hayes with a copy of his file. AR 369. Hayes does not explain how the delayed production of these documents prejudiced him, and he cites no authority applying heightened review under similar circumstances.

It is true that the Administrator and the Plan's counsel first told Hayes that he could not appeal the suspension of his benefits without clearing preliminary hurdles. AR 334 (Administrator writing on November 8, 2013 that, before he could appeal, Hayes must first "explain 'why the determination should be reviewed'"); AR 341 (Plan's counsel writing on December 30, 2013 that "this matter is not subject to appeal until Mr. Hayes has fulfilled his obligation to provide the requested documents and has either provided evidence to rebut the above presumption [that he had worked more than forty hours per month at Alltech] or has declined in writing to do so"). These assertions contradict the Plan. It says that a participant or beneficiary who receives an adverse benefit determination may "submit a written appeal of the determination to the Plan Administrator explaining why the determination should be reviewed," and that any appeal "*may*" be accompanied by "written comments, documents, records, and other information relating to the claim for benefits which you or your beneficiary believes will support the claim." AR 786 (emphasis added). The phrase "explain[ing] 'why the determination should be reviewed,'" AR 334, refers to the content of an appeal, not to a prerequisite to an appeal, and the submission of documents in support of any appeal—though usually wise—is permissive, not mandatory. Regardless, the Plan did not hold to this position. The Plan's subsequent communications with Hayes did not reiterate it, and the Appeals Committee's final decision contains no similar rationale, *see* AR 951–57. Hayes does not explain how he was prejudiced by the Plan's

initial assertion of this position; he does not describe how it altered his or his lawyers' pursuit of his claim or caused a "serious breach of the plan administrator's fiduciary duty" to him. *See Woo*, 144 F.3d at 1160.

Though Hayes is correct that his administrative process lasted over thirty-one months (from the October 15, 2013 suspension of benefits to the June 2, 2016 final decision), and that this seems like an unnecessarily long time, Hayes shares responsibility for this delay. The record shows that Hayes's then-lawyers chose to pursue a process that inevitably would take more time. Rather than file a single appeal consolidating Hayes's supporting evidence, they instead pursued an iterative process that involved going back and forth with the Committee identifying, gathering, and submitting relevant information. This was not unreasonable. Hayes's lawyers may have concluded, for example, that a back-and-forth administrative process held a greater chance of generating information helpful to Hayes's claim or a more complete record. Though it is true that the Plan took too long to do certain things within this process, so did Hayes. For example, in March 2015, Hayes's then-counsel submitted what he called a "supplement" to Hayes's claim. AR 240.[7] The Plan did not respond to this submission, prompting Hayes's counsel to email

_____

[7]    Hayes seems to assert in his brief that his attorney's March 2015 submission was the appeal of his benefit suspension. Pl.'s Mem. in Supp. at 12. If that is what Hayes means to say, he is incorrect. Hayes's then-counsel repeatedly described his March 2015 submission as a "supplement" to Hayes's claim or appeal, and not the appeal itself. AR 240. He reserved the right to continue submitting—and did submit—additional evidence supporting the claim, AR 240, 251, 944, meaning the submission might not be Hayes's final word on the appeal. And, to establish Hayes's compliance with the Plan's sixty-day appeal deadline, AR 786, Hayes's counsel asserted in his March 2016 submission that Hayes had lodged his appeal through his letter of November 14, 2013, AR 245.

the Plan's counsel in July, four months later. AR 942. The next day, the Plan's counsel identified additional evidence that Hayes might submit to support his claim, AR 941, but that information was not submitted until January 2016, roughly six months later, AR 944; AR 3–165. The record implies no reason why this part of the process had to take some ten months (or, for that matter, why these things were not done earlier in the process). The record does not suggest that Hayes was then seriously troubled by the duration of the administrative process. Except for a four-month period from roughly August to November 2014, Hayes was represented by counsel throughout the process. *See* AR 360–61, 373. Hayes identifies no contemporaneous objection to delay, and a thorough review of the record filed with the Court shows that it contains no correspondence or other document reflecting such an objection.[8] In his briefs, Hayes asserts that the Plan's "appeal procedure did not bear even a passing resemblance to the appeal procedures provided by the Plan or required under the Department of Labor regulations," Pl.'s Mem. in Supp. at 22, that the Plan "seriously flout[ed] the time periods provided by the Plan and the Department of Labor Regulations," *id.* at 24, and that the administrative process "fail[ed] to comply with the claim processing deadlines provided by the Plan," *id.* at 30. But no regulation, Plan term, or deadline is cited to support any of these assertions. Considering the number of possibly applicable regulations, *see generally* 29 C.F.R. § 2560.503–1, a guess as to which

---

[8]     The Claim Appeals Committee's final decision on Hayes's claim occurred June 2, 2016. AR 951. Hayes commenced this action on November 29, 2017, nearly sixteen months after the Plan's final determination of his benefit claim. *See* Compl.

ones Hayes thinks were violated would be impracticable.[9]  Hayes has not shown that the

delays he experienced were attributable to serious procedural irregularities caused by

Defendants.[10]

*

The Claim Appeals Committee's final decision on Hayes's administrative appeal

will be reviewed for abuse of discretion.

B

1

The Eighth Circuit applies two distinct tests to determine whether an ERISA plan

administrator's benefits determination was reasonable and not an abuse of discretion.  First,

to determine whether an administrator's interpretation of plan terms was reasonable, the

court applies the five-factor test from *Finley v. Special Agents Mutual Benefit Ass'n*,

---

[9]     Hayes cites *Gordon v. Metropolitan Life Insurance Co.*, 747 F. App'x 594 (9th Cir. 2019), as support for his argument that "a decision on the appeal of a denied claim 'years after the . . . deadline to do so' is a 'wholesale and flagrant violation of both ERISA and the benefit plan' and requires *de novo* review."  Pl.'s Mem. in Supp. at 24 (alteration in original).  Even if it were binding precedent, *Gordon* is distinguishable.  There, the administrator faced a ninety-day deadline to issue a final decision on a long-term disability benefit claim, "failed to issue a final decision," and failed to explain why it had issued no decision.  747 F. App'x at 595.  Here, Hayes has identified no "deadline" governing the Appeals Committee's final decision.  The Committee issued a final decision.  And the time it took to issue the decision was for all practical purposes as much Hayes's doing as the Committee's.

[10]     Hayes argues that the Committee's decision to apply the Plan's presumption of Disqualifying Employment against him was a procedural irregularity.  Pl.'s Mem. in Supp. at 20–22.  The Plan's decision to apply the presumption was central to its substantive decision to affirm the suspension of Hayes's benefits.  It will be considered as part of the review of the Committee's final decision and not as part of the determination of the standard of review.

957 F.2d 617, 621 (8th Cir. 1992). *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (en banc); *see also id.* at 1014 (Gruender, J., dissenting). The five factors to be considered ask whether the administrator's interpretation (1) is consistent with the goals of the plan; (2) renders any language of the plan meaningless or internally inconsistent; (3) conflicts with ERISA; (4) is consistent with the administrator's prior determinations regarding the terms at issue; and (5) is contrary to the clear language of the plan. *Peterson v. UnitedHealth Group Inc.*, 913 F.3d 769, 775–76 (8th Cir. 2019). "While these non-exhaustive factors 'inform our analysis,' the ultimate question remains whether the plan interpretation is reasonable." *Id.* at 776 (quoting *King*, 414 F.3d at 999). Second, to determine whether an administrator reasonably applied its interpretation to the facts of any particular case, the test is whether the decision is "supported by substantial evidence." *Johnston*, 916 F.3d at 714 (quoting *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011)). "Substantial evidence is more than a scintilla but less than a preponderance." *Johnston*, 916 F.3d at 714 (quoting *Green*, 646 F.3d at 1050); *see also Jones v. Aetna Life Ins. Co.*, 856 F.3d 541, 547–48 (8th Cir. 2017) (citations omitted) (same).

Other considerations are relevant to both tests. "If an administrator also funds the benefits it administers . . . the district court 'should consider that conflict as a factor' in determining whether the administrator abused its discretion." *Jones*, 856 F.3d at 548 (quoting *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 718 (8th Cir. 2014)). "A decision supported by a reasonable explanation . . . should not be disturbed, even though a different reasonable interpretation could have been made." *Waldoch*, 757 F.3d at 833 (alteration in original) (citation and internal quotation marks omitted); *see also Prezioso v. Prudential*

*Ins. Co. of Am.*, 748 F.3d 797, 805 (8th Cir. 2014) ("We must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." (citation and internal quotation marks omitted)). "[A] reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales." *Waldoch*, 757 F.3d at 829–30 (citation and internal quotation marks omitted). "Courts reviewing a plan administrator's decision to deny benefits will review only the final claims decision, and not the 'initial, often succinct denial letters,' in order to ensure the development of a complete record." *Khoury v. Group Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010) (citing *Galman v. Prudential Ins. Co. of Am.*, 254 F.3d 768, 770–71 (8th Cir. 2001); quoting *Wert v. Liberty Life Assurance Co. of Boston*, 447 F.3d 1060, 1066 (8th Cir. 2006))

2

The Claim Appeals Committee's decision affirming the suspension of Hayes's benefits is easy to summarize from a distance: (a) The Committee understood the Plan to prohibit a pensioner from receiving retirement benefits if the pensioner was working in any employment covered by the Plan (including for any employer who contributes to the Plan) for forty or more hours per month; (b) The Committee understood the Plan to require a pensioner to give written notice to the Plan within thirty days of starting work of this type regardless of the number of hours the pensioner actually anticipated working, and it determined Hayes was required to provide this notice; (c) If a pensioner was required to give this notice but did not, the Committee interpreted the Plan to require it to presume the

pensioner was working forty or more hours per month and that the pensioner had the burden to show he was not, and it determined this presumption applied to Hayes because he had failed to provide the required notice; (d) The Committee determined, after reviewing evidence, Hayes had failed to rebut the presumption that he had worked forty or more hours per month. AR 951–57.

The problem is that in reaching this final decision—including each of the decision's elements—the Committee evidently considered and applied inapplicable Plan terms. The Committee's letter describing its final determination incorrectly quotes suspension-of-benefit provisions applicable to Normal Retirement Benefits. AR 952–54. But Hayes was not receiving Normal Retirement Benefits; all agree he applied for and was receiving Unreduced Early Retirement Benefits, a different class of benefits. Defs.' Mem. in Supp. at 4; Pl.'s Mem. of Supp. at 4. The Plan contains a different subsection with suspension-of-benefit rules applicable to Unreduced Early Retirement Benefits. AR 1194–97. The Committee's final decision should have cited to, and demonstrated consideration of, the suspension-of-benefit rules applicable to Unreduced Early Retirement Benefits, but it did not. The two sets of provisions seem different at first glance, but more on that in a bit.

At least ordinarily, the law tilts in favor of finding an abuse of discretion when an ERISA plan administrator reaches an adverse benefits determination based on an inapplicable plan document or term. *See, e.g.*, *Huss v. IBM Med. and Dental Plan*, 418 F. App'x 498, 504 (7th Cir. 2011). Applying the wrong term of a plan would run counter as a general rule to the Eighth Circuit's *Finley* factors. It is difficult to think of

something more "contrary to the clear language of the plan" and ERISA than adjudicating a claim under inapplicable terms of and ERISA plan (and not adjudicating a claim under applicable terms), and applying an incorrect term at least would pose a risk of inconsistency with the goals of the plan. *See Peterson*, 913 F.3d at 775–76.

The Parties' positions on how this issue should be resolved in the context of their cross-motions for summary judgment are not clear. Hayes identifies this error and asserts without elaborating that the suspension-of-benefit rules applicable to Normal Retirement Benefits and applied by the Committee are "materially different from the" rules applicable to Unreduced Early Retirement Benefits. Pl.'s Mem. in Supp. at 15 (citations omitted). But Hayes does not rely on this error to argue that the Committee abused its discretion. Defendants do not address this issue. They cite the Plan's suspension-of-benefit rules applicable to Unreduced Early Retirement Benefits and defend the Committee's decision as if the Committee had considered and applied these rules. *See, e.g.*, Defs.' Mem. in Supp. at 3–4 (citation omitted); Defs.' Resp. Mem. at 7. It seems, then, that Hayes and Defendants would have the reasonableness of the Committee's final decision judged against the suspension-of-benefit rules for Unreduced Early Retirement Benefits though the Committee's final decision considered and applied different rules.

The Parties' positions would make sense if the Committee actually had considered the correct Plan terms and its citation in its final decision to the suspension-of-benefit provisions for Normal Retirement Benefits was a clerical error, but that does not appear to be the case. It is true that the record shows the Parties understood which Plan terms applied and considered them at earlier points in the administrative process. In earlier

correspondence, for example, the Plan and Hayes cited correctly to the suspension-of-benefits provisions applicable to Unreduced Early Retirement Benefits. AR 246, 329–31. But the Committee's final written decision cites and applies only the suspension rules for Normal Retirement Benefits and gives no indication the Committee actually considered or applied the correct rules. *See* AR 951–57. Also, the minutes of the Committee's April 21, 2016 meeting at which it reached its final decision do not show the Committee considered the correct Plan terms or acted on a basis other than what was described in its final decision. *See* AR 548–56. They say only that the Committee voted to "deny the appeal based on the recommendation and explanation provided by Fund Counsel." AR 555.

The conclusion that the Committee's reliance on an inapplicable Plan term warrants finding an abuse of discretion also would be dubious if there were no material differences between the inapplicable and applicable plan provisions or application of the inapplicable terms had no identifiable bearing on the Committee's decision. But it is not possible to say that is the case here. Some elements of the Committee's decision implicate material and potentially dispositive differences between the incorrect terms considered by the Committee and the terms it should have applied, and some Plan terms the Committee should have applied pose difficult interpretive problems. Consider, for example, the Committee's decision to presume Hayes was working forty or more hours per month because he assertedly failed to give notice. The inapplicable term the Committee considered provides:

If a Pensioner has worked in Disqualifying Employment in any
month and has failed to give timely notice to the Plan of such
Disqualifying Employment, the Trustees will presume that he
worked for at least forty (40) hours in such month and any
subsequent month before the Participant gives notice that he
has ceased Disqualifying Employment.

AR 953, 1177. For purposes of this term, the Plan defines "Disqualifying Employment"

as:

[E]mployment or self-employment that is (i) in an industry
covered by the Plan when the Pensioner's pension payments
began, (ii) in the geographic area covered by the Plan when the
Pensioner's pension payments began, and (iii) in any
occupation in which Plan Participants work (including, but not
limited to carpentry, millwright, and pile-driving positions and
Alumni Employee positions).

AR 952–53, 1176. The term the Committee should have applied is different. It provides:

If a Pensioner has worked in Disqualifying Employment in any
month and has failed to give timely notice, the Plan is entitled
to presume that the Pensioner worked sufficient hours in that
month and all later months before the Pensioner gives the
required notice to cause suspension of benefits. The Pensioner
may overcome this presumption by providing evidence
satisfactory to the Plan that the work should not have resulted
in suspension of benefits.

AR 1196. For purposes of this term, the Plan defines "Disqualifying Employment" as

"[a]ny employment of forty (40) hours or more in a one (1) month period in Covered

Employment." AR 1194. The Plan, in turn, defines "Covered Employment" to include

"[e]mployment for which the Employer has agreed to contribute to the Pension Fund."

AR 1152. The applicable notice/presumption provision, and how it might apply to Hayes's

claim, is difficult to understand because the inclusion of "work[] in Disqualifying

Employment" as a prerequisite (along with the failure to give timely notice) to the

presumption that a pensioner "worked sufficient hours . . . to cause suspension of benefits," AR 1196, makes no sense in view of the provision's evident purpose. This is because one element of the definition of Disqualifying Employment is "employment of forty (40) hours or more in a one (1) month period." AR 1194. But the point of the provision is to permit the Committee to presume a pensioner violated the forty-hour rule and shift the burden to the pensioner to show that he did not. Construed literally, then, the provision seems to condition the Plan's discretion to presume a violation of the forty-hour rule on first establishing a violation of the forty-hour rule. That seems like a problem.[11] In addition, the inapplicable term the Committee considered says the presumption applies to the months "before the Participant gives notice that he has *ceased Disqualifying Employment*." AR 1177 (emphasis added). The term the Committee should have applied uses a different phrase; it says the presumption applies to months "before the Pensioner gives the required notice *to cause suspension of benefits*." AR 1196. How the Committee might have interpreted the correct Plan terms or applied them to Hayes's claim is not clear, but it cannot reasonably be said that the differences between these terms would have no bearing on the Committee's decision.

---

[11]     The presence of poor drafting does not diminish a claims administrator's discretionary authority to interpret an ERISA plan. Plans sometimes contain "terrible" word choices, *Dame v. First Nat'l Bank of Omaha*, 217 F.3d 1018, 1020 (8th Cir. 2000), but "reconciling the conflicting provisions of the plan by dealing with the difficulties posed by its language is precisely the task entrusted to a plan administrator vested with interpretative discretion by the plan document," *Frye v. Thompson Steel Co.*, 657 F.3d 488, 495 (7th Cir. 2011). "[A]n administrator's interpretation of uncertain terms in a plan will not be disturbed if reasonable." *Kutten v. Sun Life Assurance Co. of Canada*, 759 F.3d 942, 944 (8th Cir. 2014) (citation and internal quotation marks omitted).

Accepting the Parties' invitation to judge the reasonableness of the Committee's final decision against Plan terms the Committee did not apply would go too far. It would require implying assumptions about how the Committee might have understood materially different, unclear Plan terms it did not consider, and it would require guessing as to how the Committee might have applied those assumed understandings to the facts of Hayes's claim.

### 3

A remand to the administrator is appropriate when "an ERISA-regulated plan denies a claim for benefits based on an unreasonable interpretation of terms in the plan," *King*, 414 F.3d at 1005, and where it remains unclear whether a claimant was denied benefits to which he was entitled, *see Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 396 (6th Cir. 2009) (citations omitted); *Greenwald v. Liberty Life Assurance Co. of Bos.*, 932 F. Supp. 2d 1018, 1048 (D. Neb. 2013). As discussed in Part II.B.2., above, the first condition is present here. So is the second. Though the administrative record contains a significant volume of information regarding Hayes's post-retirement work at Alltech, none of that information eliminates any genuine dispute of material fact about whether Hayes violated the Plan's forty-hour rule under any reasonable interpretation of the suspension-of-benefit rules applicable to Unreduced Early Retirement Benefits.

### C

An ERISA claimant may seek relief in the same complaint for benefits under 29 U.S.C. § 1132(a)(1)(B) and for equitable relief for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) "so long as [the] two claims 'assert different theories of liability.'"

*Jones*, 856 F.3d at 547 (quoting *Silva*, 762 F.3d at 728 & n.12). The fact that a claimant seeks "the same amount of money" under a § 1132(a)(3) claim as a § 1132(a)(1)(B) claim does not mean the theories of liability are the same. *Silva*, 762 F.3d at 728 n.12. A theory of liability under § 1132(a)(3) is the same if the arguments a claimant "makes to reach that remedy" are not "alternate, equitable theories of liability." *Id.* (citation omitted). In *Jones*, for example, the Eighth Circuit determined that a claimant asserted different theories of liability because one count asserted that she had been denied benefits under the plan, and the second count asserted the administrator had "used a claims-handling process that breached its fiduciary duties." 856 F.3d at 547.

Here, Hayes does not pursue a different theory of liability under his § 1132(a)(3) fiduciary-breach claim from his benefits claim under § 1132(a)(1)(B). Hayes alleges in his Complaint that Defendants breached their fiduciary duties by suspending his benefits and "recoup[ing] alleged overpayments from [his] past and future pension benefits." Compl. ¶ 70. This is the same general basis upon which he seeks recovery of benefits under § 1132(a)(1)(B). In his summary-judgment briefing, Hayes identifies more particular facts in support of this claim:

> Defendants breached that [fiduciary] duty in manifold ways, including applying a presumption to deny Mr. Hayes' claim contrary to the terms of the Plan, acting on his claim without a Committee quorum, denying him access to documents he was entitled to under the Plan's claims procedures and failing to comply with the claim processing deadlines provided by the Plan. Ultimately, these breaches of fiduciary duty, singly and in the aggregate, denied Mr. Hayes a full and fair review of his claim, for which he is entitled to make-whole equitable relief, including estoppel, reformation and surcharge.

Pl.'s Mem. in Supp. at 30 (citation omitted). These are the same facts and theories on which Hayes grounds his claim for benefits. Even if they were not, as explained above, his allegations that the Committee acted without a quorum, that he was denied access to documents, and that the Committee failed "to comply with claim processing deadlines," *id.*, are not supported and would not show a violation of § 1132(a)(3). Hayes's allegation that the Committee applied the forty-hour-rule presumption against him "contrary to the terms of the Plan," *id.*, will be considered on remand.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.      Plaintiff's motion for summary judgment [ECF No. 33] is **DENIED**;

2.      Defendants' motion for summary judgment [ECF No. 35] is **DENIED IN PART** and **GRANTED IN PART**. The motion is denied to the extent Defendant seeks summary judgment on Plaintiff's claim under 29 U.S.C. § 1132(a)(1)(B). The motion is granted to the extent Defendant seeks summary judgment on Plaintiff's claim under 29 U.S.C. § 1132(a)(3); and

3.      This matter is **REMANDED** to the Plan for administrative proceedings consistent with this Opinion and Order. The Court retains jurisdiction over this matter.


Dated:  July 10, 2019                          s/ Eric C. Tostrud
                                                         Eric C. Tostrud
                                                         United States District Court